May it please the court, my name is Gregory Meditz. I am the plaintiff appellant in this case. Are you a lawyer? Yes, yes Your Honor. And you're, I'm sure they would have checked it. Oh no, I'm just talking, I'm just talking. You're authorized before the Third Circuit. Well, I think he's, I'm not admitted to the Third Circuit, but I'm a licensed attorney in the state of New Jersey. Yeah, pro se's can argue. I've heard pro se's argue. I was just going to say that your, your brief seems to indicate some knowledge of the law. Thank you, thank you Your Honor. I'd like to reserve three minutes for rebuttal. It's granted. In this Title VII disparate impact case, the primary issue on appeal is the manner in which the district court defined the size of the relevant labor market. It's my contention that it was designed in a restrictive manner which led the court to conclude that I had not established a case of disparate impact. In previous similarly structured Title VII disparate impact cases, which involved employment related residency ordinances, the New Jersey District Court has construed the relevant labor market as those areas from which the subject municipality would draw qualified employees in the absence of the offending policies. And that approach makes sense because it seeks to isolate the discriminatory effect, if any, of the offending policy by removing it from the picture and projecting hiring patterns without that policy. And that analysis also includes employing labor market data and commuting times. That approach was not taken in this case. The district court did something totally different. And your basis for making what you've just described as the relevant, well actually, could you put on the record exactly what you believe the relevant market was? I know you believe that his definition was incorrect. It was too narrow. It was too narrow, I get that. What exactly do you think the relevant labor market should have been? I believe that the relevant labor market should have been defined as those areas which the City of Newark would draw employees in the absence of these residency policies. Explicitly, didn't you say all of Essex and five other surrounding counties of Essex, Hudson Union, Moores and Bergen. I just drove up at New Jersey Turnpike. It was very slow in places, and I thought a lot about New Jersey. So the district court in this case... And you say that because you think those are the areas from which, absent this residency requirement, Newark would have drawn white, non-Hispanic applicants. That is correct, Your Honor. And the reason why, one of the reasons why I come to that conclusion, because the City of Newark now employs presently approximately 1,000 employees, police personnel, fire personnel, non-uniformed employees from those surrounding counties. Because they're exceptions to the residency requirement? Some of them are. Some of them some of them may be, but my point is if the city can can draw current employees from these areas, it can draw prospective employees also from these areas. You're complaining really about the fact that when you apply you have to be a resident rather than that after you accepted you have to move in. That was the question I was about to ask. Thank you. Is there, was there, it's not clear to me, was there a requirement that, let's say, the uniformed officers to whom this didn't apply would have to move into Newark afterwards, after they were hired? No, there's nothing on the record, there's no requirement for uniformed employees move into the city after they're hired. In the uniformed employee category, can they apply for a position if they do not live within the city? According to New Jersey state law, in the City of Newark's, one of the City of Newark's residency ordinances, yes they can. I thought it just didn't apply to uniformed employees. The, that you can, that other people, you couldn't apply, even apply to work in Newark, but that somebody who wanted to be a policeman, police person, could. Your Honor, that, that is correct. Okay, and, and didn't have to, and if hired, didn't have to move into Newark. That is correct. And then there were, how did the functions of a uniformed employee different, differ from that of an ununiformed employee in such a way that this restriction may reflect upon the requirements and ability to do the job? Your Honor, there, well, there is a New Jersey state statute, which prevents municipalities from requiring an applicant for a non-uniformed position to be a resident of that municipality at time of application. Oh, the New Jersey statute distinguishes between uniformed and non-uniformed applicants? Yes, it does. It specifically, there's, there are, there are two distinct statutes. One deals with police personnel. Could you talk a little louder? I'm sorry. There are two. We need you on the tape. There are two distinct statutes, Your Honor. There are, there's, there's a New Jersey state statute specifically for police and fire, police personnel. Another one for fire department personnel. So you, but we'll call them uniformed. Yes. Because they wear uniforms. Okay. And you say that the New Jersey statute says what? The, the New Jersey statute prevents a municipality, municipality from requiring an applicant for a non, for a uniform position from being a resident at time of application. Excuse me. Did he ask for rebuttal time? Yeah. Yeah. Okay. I want to be sure you saved it. Go ahead. Okay. So I'd like to proceed with my argument. Sure. So the district court did not employ that method of determining the size of the relevant labor market. Instead, and based on my reading of the district court opinion, the district court employed four factors that it used to determine the size of the relevant labor market in this case. I'll state the factors and then I'll try to address them. Go ahead, yeah, argue. Number one, whether the, whether the general population of the municipality, of the municipality is large. Number two, whether the general population of the municipality is diverse. Number three, whether, whether the population of the protected group at issue is less than one percent of the general population of the subject municipality. Who is the protected group at issue? White person is not of Hispanic origin. Okay. So say that again. What's number three? Number three is whether the population of the protected group at issue is less than one percent of the general population of the subject municipality. Go ahead. And the fourth factor is, protect, all right, go ahead, I'm, yeah. The fourth factor is whether the, whether the protected group at issue comprises one percent or less of the at-issue jobs. In this case, the at-issue jobs would be the City of Newark non-uniformed workforce. Non-uniformed? Yes. And he adopted that test because of Harrison? Your Honor, I'm, I'm not exactly sure why they adopted this test, but the court seemed to infer that because this case was not, was not exactly statistically like Harrison, that the labor market should not be defined beyond the borders of the City of Newark. What in the private employment market, are there any, is there any evidence which reflects for private employee, employers, what percentage of employees come from within the City of Newark, Newark, I'm sorry, I come from Delaware so I say Newark, come from within the City of Newark and what from the surrounding counties? Your Honor, oh, are you saying with respect to non-uniform, non-uniform City of Newark employees? Private? If Prudential is hiring, if a local employer in Newark is hiring, what percentage overall of private employers, what percentage of employees come from within Newark and what percentage of outside of Newark? I, I don't have the data to support, to, to answer that particular question. It wasn't put in. It's not, not of record, okay? Is that, yeah. That's, that's correct. So these, these four factors which the District Court seemed to employ to define the relevant labor market in this case, these four on isolating the discriminatory effect of the offending policy. Some of them are arbitrary, some of them are, some of them are nebulous and vague. Do they relate to the ability of the applicant to do the job? No, no, that's, that's the business necessity defense. I'm, I plan to get to that shortly. So you're, you're on the dispowered impact? That's correct, Your Honor. Aspect. Okay. So I'd like to move on to the business necessity defense. The only defense... Is it business necessity or business justification? It's more commonly referred to as a business necessity defense, Your Honor. The only defense to a Title VII disparate impact claim where the discriminatory effect is a business necessity defense. Now what does that mean? I found the answer in a 2007 Third Circuit decision titled L versus SEPTA. And in L, the court put forth the following definition of business necessity defense. The court must show that a discriminatory hiring policy accurately but not perfectly ascertains an applicant's ability to perform successfully the job in question. The district court did not employ this definition in its business necessity, business necessity defense analysis. Do you, do you know to say what page that comes from? I have L in front of me. Oh yeah, it's, it's, I see it. It's okay. All right. Well, I see it in page 12, 479 F3rd. It's 232. Putting these standards together then we require that employers show that a discriminatory hiring policy accurately but not perfectly ascertains an applicant's ability to perform successfully the job in question. Yes, that is the current business definition of the business necessity defense. The district court, the district court's analysis of the business necessity defense did not involve it, did not involve the justifications offered by the city and my ability to perform successfully the job in question. The reason why that is, the district court relied on an old version, an old definition of the business necessity defense, which is a Ward's Cove packaging definition of business necessity. Would you say that again? The Ward's Cove packaging definition of business necessity. That was effectively overturned by the 1991 Civil Rights Act. So the foundation upon which the district court's business did employ the correct definition, it would find that defendant has not offered any evidence at all showing that there's a connection between their residency policies and my ability to perform successfully the job in question. None. There were some, there were some conclusory statements and that's about it. Mr. Meditz, your red light is on. I don't want to cut you off too much. Do you have much more to say? I wanted to address the evidentiary issue, if I may. All right. Thank you, Your Honor. Defendant filed a summary judgment reply brief. Attached to that brief, attached to that brief was an exhibit, a three-page typed exhibit. It was an unsworn statement. It was not an evidence. Therefore, I filed a motion to strike with my primary argument being that this is not proper summary judgment evidence. The court was not swayed by that argument. Instead, the court said because the information referred to in the statement is readily available public information and that it should have come as a revelation to me that it existed, it's therefore admissible on summary judgment. I think your first argument is stronger. Yeah, I do too. I wouldn't dwell on this one. I wouldn't worry about this one. Yeah. Okay, Your Honor. Well. Okay, I think we should hear from Newark and you get rebuttal. Thank you, Your Honor. Is that all right with you? Oh, yeah, absolutely. Absolutely. Good morning, Your Honors. May it please the court. My name is Amelia Perez. I'm an assistant corporation counsel and I represent the city of Newark. I'm going to speak louder because we, believe it or not, we listen to the tape. Okay. Is this loud enough? Yes, we'll see how it comes out. Go ahead. Your Honors, the district court properly held that the statistical evidence that was presented by plaintiffs do not show a substantial disparity as in the case in Harrison, as in the Harrison case. Why don't you start with the question as to whether the district court was justified in limiting the geographic area to Newark as distinguished from the surrounding counties from which it took uniformed employees and certain other non-uniformed employees. The district court was justified in limiting the areas from which, within the borders of the city of Newark. Given the size of the city, the city has 270,000 residents of which 38,950 are white and it's a very diverse city and the district court properly focused on the fact that unlike the Harrison case where the municipality consisted mostly of white residents and no one had ever been, no African-American had ever been employed, this is different than the Harrison case. It's the population of the city. But the district court did take into account, well, Newark hired uniformed employees who were non-residents, so why shouldn't it have been willing to at least take applications from non-uniformed employees? I mean, what does the size of the city have to do with that? The size of the city is the same whether you're talking uniformed employees or non-uniformed employees. Well, unlike the plaintiff stated to the court, the city does require continuous residence for police officers and firefighters. Continuous, will it take applications from non-Newark residents for police or for fire? No, the police officers and the applicants for police officers or firefighters position must maintain residency within the city from the time of the application through their appointment. It's a 12-month mandatory period of residency that they must complete. Well, that's a big factual difference between what Mr. Metis tells us is the rule and what you tell us is the rule. Where in the record is the city's policy? Then we have to... This isn't from civil, it's a law, Your Honor. Where in the record does it talk about this rule, about the actual statistics? We provided evidence with the summary judgment motion as to that. Is this the unsworn affidavit that Mr. Metis is concerned about? Yes, and we'll get to that later. Okay, well, the unsworn affidavit simply clarifies the application process that the city uses. This is something that's ready to be available to the public and I believe Mr. Metis was familiar with it also. He claims that he was blindsided by this information, but this information is on the Civic Public Commission website and in the Department of Personnel website. So, the affidavit was simply clarifying what's already out there. If we find that the statistical data and calculations that the district court entered into were flawed, are we required to reverse? No, because I believe the city has substantial business justifications or business necessity for employing this Well, where I thought, you just told us there is no residency requirement. There is one point. I thought I asked you and you said it doesn't exist unless I misunderstood. Is there, let me ask you, is there a residency requirement that Newark employs for non-white, no, for white non-Hispanics for civil service jobs? Let's put it that way. There is a residency requirement for non-uniform positions within the city of Newark. There is. And there is a residency. And is that in the record? That residency requirement? Yes, the ordinance is on the record. Okay, so there's an ordinance that says, how, where is the ordinance? Do we have the ordinance in front of us? Come on, bring it up. What does it say? It says that in order to apply or maintain employment with the city of Newark, you have to be a resident of the city of Newark with certain exceptions, meaning if the city, if it's a highly skilled job or position and the city cannot. There are three things. One is health. The highly skilled. But they're pretty minor, right? Yes. Okay, go ahead. So we do have a residency requirement for non-uniform positions. Okay, and that's for people. So what is the justification for that? Well, the city has a few justifications for that. For one, it's that it promotes the economic growth and prosperity of the city by reducing the high unemployment rates of minority, of inner-city minority groups. What does that have to do with the ability of the person to perform the job? There's a few of them. Yeah, but I'm starting with the first one. What does that have to do with the ability of the applicant to perform the job? Well, requiring residency within the city at the time of employment. At the time of the application. Application for employment increases the quality of employee performance as residents of the city tend to have a personal. Okay, but what does that have to do with the ability of the applicant to perform the job? Well, in the city's belief, because the applicant would have a greater personal knowledge of the city's condition and a feeling of greater personal stake in the city's progress, it would encourage better performance. Wouldn't you think that that would be true for uniformed employees? I mean, it seems to me that police and fire people should also have that kind of knowledge and information. Why would you distinguish between uniformed and non-uniformed? There is a residency requirement for uniformed employees. They have to live in the city for at least 12 months at the time of the application and at the time that they sit for the examination, your honor. But 28.3 percent of the city's uniformed employees are not subject to the residency requirement. And 9.2 percent of the non-uniformed employees that whites comprise, 9.2 percent of the city's non-uniformed employees which are subject to the residency requirement, but only 28.3 percent of the city's uniformed employees which are not subject to the residency requirement. Now that's a three-to-one discrepancy. And how can we say that uniformed employees, that the role of a uniformed employee is that different from that of a non-uniformed employee, that this discrepancy, this difference should exist? No, and the percentage of white uniformed employees in the city of Newark is 28.31 percent. Those uniformed employees were required at a certain, when they sat for the examination and when they applied to be residents of the city of Newark. But 28.3 percent of the city's uniformed employees are white non-Hispanic, is that? That's correct. And only 9 percent of the non-uniformed employees? 9.4 percent of the non-uniformed employees are white non-Hispanics. And there's a New Jersey state statute dealing with hiring of police and fire, is there? Correct. And what does that provide? Well, under the statute, the city is allowed to require that initial 12-month residency requirement for uniform positions. Do they have to be a resident when they apply? Yes, they do have to be a resident of the city of Newark when they apply and through the whole application process. And maintain residency for at least 12 months. Can we go back to, I'm sorry, you're following up. Yeah, what are you reading from when you tell us that they have to be residents when they apply? This is the uniformed employees? Yes. Yeah, I'm looking at the back of the blue brief. What says that? This is information from the Civil Service Commission. Well, isn't it in your, it must be in your brief. Are you telling us that everything that that it's untrue, that there's this distinction? I'm contesting with this point in his brief, the distinction, his allegation that the city doesn't require at all a residency for uniform positions. When they apply? When they apply, correct. Okay, fire department's priority of eligibility for initial appointment. In any municipality of the state, before a person can be appointed, they have to be, the positions will be filled in the following classes. One, residents of the municipality. Two, other residents of the county in which the municipality is situated. Three, other residents of the state. Four, all other qualified applicants. So I gather that there, you go down the line and you consider the categories, but this says that you don't have to be a resident of the city of Newark. But the city has a discretion to consider their residents first. And there is a policy that we have. They consider their residents first, but that doesn't exclude their ability to consider other applicants. That's correct, Your Honor, but the ordinance doesn't exclude the city's ability to consider other applicants either. The ordinance which he's questioning. Well, but he's saying that his application wouldn't even be considered. Well, he applied to sit for the examination with the Department of Personnel, and the Department of Personnel rejected based on the positions on there which required highly, I guess, highly skilled, high skills, and which Mr. Meadows would have been qualified for, and he didn't apply for that. He applied for the position which required residency. So there were other positions on there. Okay, why does it require, well, let's go back to that. Why does it require a residency? I thought you said they didn't require a residency. I'm not sure I understand what you're telling us. Yeah. If Mr. Meadows applied for a position, and he says he was not considered because he wasn't a resident, is that true? He wasn't considered based on a residency requirement because it wasn't a position that fell under one of our exceptions. Well, why should there be a residency requirement for somebody to apply to work in Newark? There is a residency requirement was for candidates who sit down to take the examination. Okay, let's start with that. Why was there a residency requirement for somebody to take the examination? A non-uniform, non-minority, non-Hispanic. Why is there a residency requirement for that? There was a residency requirement for everybody. It wasn't only, there was nothing in there that required residency based on race, on anybody's race. There were other people that were rejected, and there were minorities also. She just wants to know what's the basis, what is the rationale, what's the reasoning for having it? Housing development analyst is the job. Housing development analyst is the position that he applied for. So the question is just what's the rationale that the residency requirement should apply? That's all. Well, because it wasn't one of the, it's not one of the positions that fall under the exceptions to the ordinance. And why is there an ordinance that requires exception? I'm so, we're not getting, I'm not getting an answer from you that really, I think, that meets the question. Well, the city, under the state statute, the cities, every municipality is allowed to have this sort of ordinance and to enact residency ordinances. But if they have a disparate impact, doesn't that then present a constitutional problem? If they have a disparate impact. And that goes back to my statistical question from 10 minutes ago, which I didn't get the answer to. And that is, if we find that the statistical analysis that the district court engaged in is flawed, is that in and of itself a basis for reversal? And if you say no, why not? No, I don't believe so. Because even if the court were to find that the district court erred in the application of the, I guess, statistical analysis to this case, the city has business justification which would overcome this, any disparate impact. He engaged in a certain statistical analysis that arose from his reading of Harrison. Now, the, he tried to draw a distinction between NAACP versus Harrison and this case, right? Yet, if you chart out the different bases for their actions, it's strikingly similar, the bases that Harrison had and the bases that Newark proposes. That's one problem. Then, of course, there's the statistical analysis. He looks at the percentage of black applicants in Harrison and then says, well, sort of blithely, since there are more whites in Newark, that's fine without really any critical statistical analysis. And it would appear that the standard deviation analysis that he alludes to on page 6 of his opinion over to page 7 is flawed because the standard deviation calculations just don't match what he statistics in the Harrison case and they focus on the fact that the city of Harrison had never had 0% African-American employees in their municipal workforce as opposed to here where the city of Newark is comprised of 14.2% whites of non-Hispanic origin and we employ 9.24% of whites of non-Hispanic origins. Yeah, but he really engages in no real analysis. He just says, well, you know, 14 is better than 0, 9 is better than 0, so we're okay. Isn't that problematic that there really isn't no piercing or real delving into the statistical underpinning for his conclusion? Well, the court, I guess, defined the reason why the court didn't delve into much into the statistical analysis was because it defined the relevant labor market within the city of Newark, within the borders of the city of Newark. That goes back to the question I asked you before, which is in Harrison, the relevant labor market was defined more broadly. Here, it's as narrow as can be. Isn't that so? The relevant labor market in Harrison was Bergen, Hudson, Essex, and Union. Right? I agree. That was the relevant labor market in Harrison. So that distinguishes Harrison. Let me ask you a question, a straight one. On page six of Mr. Metis' brief, he says, straight, flat out, uniformed and non-uniformed employees are subject to different residency requirements. Is that true? Uniformed employees. It says, I'm just reading from page six. Uniformed and non-uniformed employees are subject to different residency requirements. Is that true? If you look at the ordinance that applied to the positions that he applied for. No, no. I'm just taking this, leave aside what he applied for. Just this sentence. Uniformed and non-uniformed employees are subject to different residency requirements. Is that true? They both must be residents of the city of Newark. So you're saying it's not true? It's not true. I don't agree. Because we have... It says, let me go on. And citing the appendix. It says the city of Newark maintains employee residency requirements for non-uniformed employees in Newark ordinance 2 colon 24 dash 1.1. And that's appendix of 45. Right? Correct. The city also maintains a policy of requiring applicants for non-uniform employment positions to be residents of the city of Newark. Right? Right. Those are true. Okay. And then pursuant to New Jersey law, uniformed employees are exempt from municipal residency requirements such as those contained in that Newark ordinance. Is that true? I don't agree, Your Honor. He cites, he gives us the addendum, and that's not true? That's at page 6 dash 7? With the affidavit that we provided based on the information that's on the civil service commission website indicates that... That's the thing that he is challenging the admission of? Is that that thing? Correct. That indicates that in order... That the city of Newark requires continuous residence for police off... Residency for police officers and firefighters. And they must maintain residency within the city from the time of application through appointment and completion of a mandatory 12-month working test period. He also says the statutes exempt applicants for uniformed city of Newark positions from being residents at the time of application for employment. And gives us a page of the addendum. That's not true? He has an untrue statement in his brief? Which I must say is sanctionable, you know. So can we sanction him for stating something that's untrue? That's up to the court's discretion if they want to sanction him. Yeah, but is it... Are you telling us it's untrue? I'm just trying to find out what the facts are in this case. It's untrue based on the certification that we provided which contained information that's in the civil service commission website. I guess we have to decide if that's admissible or not. And the city can give preference to residents when hiring uniformed employees. Well, that's different. Okay. Well, we just have to get to the bottom of the facts. Okay. Do you have anything else you have to say to us? I want to continue making my... Get to my argument as to the... Is it problematic that the district court's relying on Ward's code? Okay. The district court decision here is consistent with the case that plaintiff relies on, which is L versus SEPTA translation of SEPTA 479F3D232. In that case, the court held that in order for an employee to successfully establish a business necessity defense when alleged discriminatory hiring policy, that policy must accurately but not perfectly ascertain an applicant's ability to perform... That's the language of L. ...successfully the job in question. Okay. I know you do. And in our case... Sorry. Go ahead. Your red light's on. But finish your sentence. And in our case, the district court held that the defendant was not required to prove that the challenge practice is essential or indispensable to its business to pass muster. And it's our contention that this rationale is in fact consistent with the same rationale that the court employed in the L case. Okay. Thank you. Your red light is on. I know you want to finish your argument, but it's the job of the lawyers to get their argument in in the time given. So thank you very much. You're welcome. You did ask for... Oh, no, you're not the appellant. You didn't ask for an appellant. Yeah. Thank you. We will, I can tell you, scan the appendix with great care. Mr. Meditz, would you... Yes, Your Honor. Please... Where... You're obviously working off of different sets of statistics unless we're not reading them correct. Can you explain that? Your Honor, I could clear up the issue with respect to uniform City of Newark positions, applicants for those jobs, whether or not they have to be residents of the city or not. They do not have to or they do have to? They do not. When they apply? When they apply. Because of the statute? Because of the state statutes. And I'm going to refer the court to... Excuse me. Before you finish that, do we have before us, have you made a challenge to the statute as being discriminatory? Your Honor, it's not the statute per se. It's a city's choice to enforce it in a discriminatory manner. You've made a constitutional claim, not a statutory claim. Okay, go ahead. Yeah, but I mean, my question is, is the statute unconstitutional? Are they challenging that? Well, Your Honor, I'm not challenging... The way I'm challenging this is... Not unconstitutional, violation of Title VII. Yeah, it creates a disparate impact. The way they enforce it. Correct. Or the statute per se. The way it's enforced. Okay. And how is it enforced? Is it by a preference as distinguished from... Because I noticed that it says they'll give preference to the following. One, residency. With respect to uniformed employees, via state statute, the City of Newark cannot require applicants for those positions to be residents of the City of Newark. And the City of Newark made this assertion in a case in 2002, in a New Jersey District Court. The name of the case is the Bronze Shields versus the City of Newark. Yeah. 214 FSUP 2D443. And that's in your brief. That was mentioned in my complaint. This, unfortunately, I didn't put this in the brief. But, in this case, the City of Newark tried to make that same assertion that non-uniformed employees have to be residents of the city at time of application. In the case before us or in the other case? In this case. I refer you to this... By this case, do you mean the Meditz case or that other case? Well... No, it's just a simple question. In the Bronze Shield case? I refer you to this case for the explanation. No, which is this case? When you're saying this. Oh, the Bronze Shields. Oh, that's what we want, yeah. In this case, the District Court went through all of the New Jersey statutes and told the City of Newark, as harshly as a district judge can, that you are not permitted, pursuant to state law, to require uniformed employees to be residents of the city at time of application for employment. And do they require civil service applicants to be residents? Well... Non-uniformed civil service applicants. City of Newark does require non-uniformed employees to be residents of the city at time of application for employment. And that's based on something in your appendix? Yes, there are discovery responses from defendant, which indicate that in my appendix. Which state it? Yes, state. Clearly state, unequivocally. Okay. And that's in the appendix? Yes, Your Honor. You understand, we have a question as to the facts that you tell us and that the City of Newark's attorney tells us. Tell us. And we've got to figure that out. The next point I would like to address on my rebuttal. As I said when I started, the primary issue in this appeal is the manner in which the district court defined the relevant labor market. There are numerous cases going back two decades where the relevant labor market is defined as the areas from which the municipality in question would draw employees in the absence of the offending residency policy. That was not followed by the district court. Okay. Do you have any more questions? Okay, thank you very much. Thank you, Your Honors. We will take this interesting case under advisement.